UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DANNY CONAWAY | ) | CASE NO. 5:11CV2295 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| vs. | ) | |
| | ) | |
| STARK TRUSS COMPANY, INC. | ) | |
| | ) | **MEMORANDUM OF OPINION** |
| Defendant. | ) | (Resolving Doc. 41) |

This matter is before the Court on Defendant Stark Truss Company Inc.'s ("Stark") motion for summary judgment. For the reasons that follow, Stark's motion (Doc. 41) is GRANTED.

**I.  FACTS**

The underlying facts relevant to the disposition of this matter are as follows. Plaintiff Danny Conaway ("Conaway") began employment with Stark as a salesman in 1999. Stark primarily manufactures roof and floor trusses utilized in residential and commercial construction projects. Stark's headquarters are in Canton, Ohio with operations throughout the United States. Conaway was solely responsible for Stark's sales for its two Texas plants. Conaway's at-will employment ended in June of 2010.

In 2007, Conaway and Stark entered into a "Covenant of Employee" ("Covenant") which contained a confidentiality clause, a non-compete clause and non-solicitation provisions. Conaway solicited counsel with regard to the compensation structure and presented Stark with an amended structure. Stark accepted Conaway's compensation language and it was included in the final Covenant. The compensation provision reads as follows:

      7. <u>Compensation.</u> During the term of Danny Conaway's employment with Stark Truss, Stark Truss shall pay to Danny Conaway:

      (a) The amount of $200,000.00 per annum, payable monthly and a commission at the rate of 25% of net profits of each of the Stark Truss plants located in the Hearne, Texas and Sherman, Texas, less the $200,000.

      (b) Stark Truss shall calculate the net profits per each of the two plants monthly and shall credit twenty-five percent (25%) of the monthly net profits to Danny Conaway's account. In computing the net profits of each plant, expenses allocated to corporate or other plants (corporate allocation) shall not exceed 5% respectively of the Hearne and Sherman plant's receipts. Stark Truss shall compute each plant's net profits and reconcile the account by January 31st of the following year. Mr. Conaway may draw against the funds that have accumulated to his account at any time.

It is undisputed that Danny Conaway received his $200,000 base salary for each year at issue in the complaint.  He disputes, however, the calculation of his commission for the years 2007 through 2009.  It is undisputed that commission *calculations* were done monthly. According to Kathy Whitcomb, Stark's payroll administrator,

> In order to permit Danny Conaway to draw against commission, each month a calculation of the net profits for the Hearne and Sherman, Texas plants was undertaken.  If there was a net profit, 25% was calculated and that amount was 'banked' to Mr. Conaway's Commission 'account.'  However, no actual funds from the calculations were deposited to an account, nor were any funds segregated.  The calculation was figuratively referred to as an 'account' or 'banked funds.'  From 2007 forward, I provided to Danny Conaway year-to-date information on the 'banked funds' and a running Commission Reconciliation Statement for each year.  Also, an annual reconciliation was performed on the 'account.'"

Conaway contends that he earned this commission monthly, and therefore the overall yearly profitability of the Texas plants did not affect his month-to-month commission earnings. Stark contends that the anticipated commission was simply set aside to allow Conaway to make draws and that his commission was not earned until the yearly reconciliation was completed in January of each year.

In 2008, Conaway met with Don Groom, who was then Stark's vice-president as well as Conaway's friend. According to Conaway and Groom, the economy had taken a turn for the worse and Stark was having financial troubles. As such, Groom asked Conaway if Stark could use $200,000 from Conaway's banked funds. Conaway orally agreed. The parties agree that this conversation occurred over a dinner in Costa Rica and that it was not reduced to writing. Later, Conaway directed Groom to withhold $40,000 from his banked funds monthly from July to October. The last $40,000 was to be adjusted in 2009. Conaway contends that this $200,000 was a loan to be repaid. Stark contends that the money was essentially a pay cut in a poor economy by a high- level employee and that it was never characterized as a 'loan."

Finally, in 2009, it is undisputed that Stark was only profitable in the months of January, March and April. Overall, the year was a poor one, with no net profit. Regardless, in line with the agreement made in 2008, at Conaway's instruction, $40,000 was deducted from Conaway's account in February of 2009. In May of 2009, Conaway took a draw against his account in the amount of $75,000. Stark contends that because there were no net profits for the year of 2009, Conaway was not entitled to any commission and therefore, filed its counter-claim for the return of the $75,000 alleged overpayment. Conaway counters that he earned commission monthly, and thus, he earned the $75,000 commission in the months of January, March and April.

Conaway filed his complaint asserting four separate causes of action against Stark: 1) breach of contract for failing to pay Conaway certain commissions due under the Compensation Agreement, 2) breach of the 2008 oral contract to repay him $200,000 loaned to Stark, 3) unjust enrichment for unpaid commissions and/or the unpaid loan and 4) fraud. Stark's counterclaim asserted that Conaway was overpaid by $75,000. Stark filed its motion for summary judgment and the matter is ripe before this Court.

## II. LEGAL STANDARD

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." *Estate of Smithers v. City of Flint*, 602 F.3d 758, 761 (6th Cir. 2010). A fact must be essential to the outcome of a lawsuit to be 'material.' *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986). Summary judgment must be entered when a party fails to make a "showing sufficient to establish…an element essential to that party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23. "Mere conclusory and unsupported allegations, rooted in speculation, do not meet [the] burden." *Bell v. Ohio State Univ.*, 351 F.3d 240, 253 (6th Cir. 2003).

Summary judgment creates a burden-shifting framework.  See *Anderson*, 477 U.S. 250. The moving party has the initial burden of showing there is no genuine issue of material fact. *Plant v. Morton Int'l, Inc.*, 212 F.3d 929, 934 (6th Cir. 2000).  Specifically,

> "A party asserting that a fact cannot be or is genuinely disputed must support the asserting by:
>
> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed.R.Civ.P. 56(c)(1).

The burden then shifts to the nonmoving party to prove that there is an issue of material fact that can be tried. *Plant,* 212 F.3d at 934.  If this burden is not met, the moving party is then entitled to a judgment as a matter of law. *Bell*, 351 F.3d at 253.  In evaluating a motion for

summary judgment, the Court must construe the evidence and draw all reasonable inferences in the light most favorable to the non-moving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  The non-moving party may not simply rely on its pleadings; rather it must "produce evidence that results in a conflict of material fact to be resolved by a jury."  *Cox v. Kentucky Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir.1996).  A fact is "material" only if its resolution will affect the outcome of the lawsuit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242248 (1986).

### III.  LEGAL ANALYSIS

**Conaway's Claims**

*Breach of Contract:*

Initially, Stark contends that it is entitled to summary judgment on Conaway's breach of contract claim against it.  To sustain a breach of contract claim, Conaway must demonstrate that (1) a contract existed (2) he fulfilled his obligations pursuant to the contract, (3) Stark failed to fulfill its contractual obligations, and (4) damages resulted from this failure.  *Second Calvary Church of God in Christ v. Chomet*, 2008 WL 834434, at *2 (Ohio Ct.App. Mar. 31, 2008); *see, also*, *Walker v. Rent-A-Center*, No. 5:06CV1232, at *8 (N.D. Ohio Oct. 19, 2007).

The parties agree that the Compensation Agreement governs this argument.  There is no contention that Conaway did not perform his employment duties, and Stark admits that he was paid compensation pursuant to the agreement.  Conaway contends that Stark failed to fulfill its obligation to pay his commission based upon his reading of the Compensation Agreement as stated above.  Conaway argues that his commission was earned *monthly* rather than *annually*.  Upon review, the Court concludes that this interpretation is not supported by the Compensation Agreement.

Conaway points to subsection (b) to support his contention that his commission was earned monthly. While a plain reading of this section provides that Stark was to *calculate* the net profits monthly and credit 25% of those monthly net profits to Conaway's "account," it goes on to say that these calculations shall then be computed and reconciled each year by January 31. Further, the express language of this section allows Conaway to "*draw against the funds* that have accumulated to his account at any time." (Emphasis added.) A reading of the entire subsection makes clear that the calculations are done monthly so that Conaway may *draw against* the amount, but that the final amount actually earned is calculated yearly. To read this subsection as Conaway asserts would render the requirement of a yearly reconciliation unnecessary, in contravention of this Court's obligation to give every term of an agreement meaning. *See Sherwin-Williams Co. v. Travelers Cas. & Sur. Co.*, 2003 WL 22671621, at *4 (Ohio Ct. App. Nov. 13, 2003).

Further, the language of this section specific allows Conaway to "draw against" the funds. It does not provide that the money is *earned* at that time. At his deposition, Conaway stated that in his previous employment he had never "had a draw against commission. A draw against commission means you have to pay the money back if you don't earn the commission; is that correct?"  He then confirmed that he did not believe he had ever had a draw. Conaway Depo., page 11. This is in direct conflict with the Compensation Agreement, stating clearly that Conaway could *draw against the funds* in his commission account. This choice of language, as proposed by Conaway and accepted by Stark, supports the Court's conclusion that the Compensation Agreement does not provide for monthly commissions earned, but rather monthly commissions calculated. The amount earned was finalized in January of each year, after the annual net profits of the plants could be determined.

During his deposition, Conaway explains the basis for his damage calculation in his complaint. Specifically, he claims that Stark miscalculated his commission in 2007 and in 2009.

*2007 Commission*

Conaway asserts that Stark owed him $187,196 from 2007. Conaway Depo. P. 38. However, evidence presented at Conaway's deposition makes clear that this payment was, in fact, made. Specifically, Stark presented Conaway with emails between himself and Kathy Whitcomb, Stark's payroll administrator, from February 1-5. Conaway Dep. Ex. E & F. In the emails, Whitcomb informed Conaway that "the reserve amount to be paid out is $187,198.00. I just want to make sure we are on the same page before I enter into payroll." Conaway responded to this email, requesting that the amount be direct deposited to various accounts. Whitcomb replied, explaining that the payroll had already been processed, and in order to split the amount between various accounts, they would have to reverse the pay that had been processed and issue live checks. Conaway replied, stating that it was fine to wait until the next pay period to directly deposit the checks.

When questioned at his deposition about these emails, Conaway stated that he had no evidence to believe that this amount was not deposited to the accounts as stated. Further, in his response to Stark's motion for summary judgment, Conaway explains that "This payment is not reflected on Stark Truss' Reconciliation Statements, which lead Conaway to believe it had not been paid at the time he filed the lawsuit. Even in light of this payment, however, Stark Truss failed to pay Conaway the proper amount of commission that he was entitled to over the course of his employment." Doc. 44, fn 8. As such, Conaway concedes that his damage calculation for 2007 was incorrect. He claimed no other damages from 2007.

*2009 Commission*

Conaway's asserted damages from 2009 again rely on his contention that the Compensation Agreement contemplates earning a monthly commission.[1]  Conaway readily admitted at his deposition that for the 2009 calendar year there were no net profits for the Texas plants.  Conaway Depo. P. 60.  He claims, however, that he is owed commission for the three months of that year that the plants did make a profit.  He claims that he was owed $132,704.  Conaway Depo. P. 61.  As explained above, Conaway's interpretation of the Compensation Agreement is incorrect.  Instead, he was entitled to a portion of the profits from the annual net profit of the Texas Plants. The parties agree that there was no annual net profit.  Therefore, Conaway was not entitled to any commission for 2009.

*Unjust Enrichment and the Compensation Agreement*

Conaway argues unjust enrichment in the alternative.  With regard to any damage claimed from the Compensation Agreement, the Court has determined that an enforceable contract governs these allegations.  "A claim for unjust enrichment is an equitable claim, and is based on a legal fiction where courts will imply a 'contract' as a matter of law. See *Wuliger v. Mfrs. Life Ins. Co*., 567 F.3d 787, 799 (6th Cir. 2009) ('Unjust enrichment is an equitable doctrine to justify a quasi-contractual remedy that operates in the absence of an express contract or a contract implied in fact to prevent a party from retaining money or benefits that in justice

---

[1] Conaway makes several statements as to why his commission was miscalculated, but fails to set forth any amount he claims owed, other than those set forth in his deposition. He asserts, for example, that Stark's accounting is incorrect because it shows negative amounts for some months.  This argument again relies on the faulty assumption that his commission was earned monthly.  He contends that his Compensation Agreement only contemplated a percentage of commission based upon the net profit of the plants and that he was not obligated to share in the Texas Plants losses.  When viewed as an annual earning, however, Conaway has failed to show that Stark ever required him to share in its annual loses.  Instead, the evidence shows, as in 2009, when the annual net profit was 0, he received no commission.

and equity belong to another.'*)*" *C. Thorrez Industries, Inc. v. LuK Transmissions Systems, LLC*, 2010 WL 1434326 (N.D. Ohio, Apr. 8, 2010).

It is clear that "[a]n implied-in-law, 'quasi-contract,' however, is neither necessary nor appropriate when an express contract governs the dispute between the parties." *Id.* "'Where, however, there is an enforceable express or implied in fact contract that regulates the relations of the party or that part of their relations about which issues have arisen, there is no room for quasi contract.'" *Id.*, quoting 1-1 Corbin On Contracts § 1.20 (emphasis added). Accordingly, because the Court concludes that there was an enforceable express contract between Conaway and Stark, the Court dismisses this claim as it relates to any claim of unpaid commissions.

*The 2008 Oral Contract*

Conaway asserts that Stark breached an oral contract between himself and Don Groom, Stark's then Vice President. Conaway contends that Groom came to him to borrow money on behalf of Stark and that he agreed to loan $200,000. Groom and Stark contend that Conaway gave it the money to see the company through a difficult economic time. Stark contends that the money was never intended to be a loan to be repaid, but rather, characterized it as a reduction in Conaway's commission. This agreement was never reduced to writing, but it is clear that Stark used at least $160,000 of the promised $200,000.

> To show a breach of an oral contract, Conaway must
> 
> "establish the existence and terms of a contract, the plaintiff's performance of the contract, the defendant's breach of the contract, and damages or loss to the plaintiff. To prove the existence of a contract, a plaintiff must show that the parties consented to the terms of the contract, that both parties had a "meeting of the minds," and that the terms of the contract are definite and certain. That is, a valid contract consists of an offer, acceptance, and consideration. An offer is defined as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it." Courts determine the existence of a contract as a matter of law.

*Inhalation Plastics, Inc. v. Medex Cardio-Pulmonary, Inc*., 2013 WL 992125, \*14 (S.D. Ohio, March 13, 2013), citations omitted.

The parties disagree as to the characterization of this oral agreement. For the purposes of this Order, mindful of this Court's obligation to view the evidence in the light most favorable to Conaway, the non-moving party, the Court will presume Conaway's recollection of the events to be true. Even presuming that the parties intended for the $200,000 to be a loan to be repaid, Conaway cannot point to any of the material terms related to the agreement. He admits in his deposition that the agreement was never reduced to writing, and that there was never a discussion about how the money would be returned, the time frame in which it would be returned, or how much interest, if any, would be paid.

"A contract is not enforceable when the terms are not sufficiently definitive. A valid contract must be specific as to its essential terms, such as the identity of the parties to be bound, the subject matter of the contract, and consideration. The terms of a contract are sufficiently certain or definite where they "provide a basis for determining the existence of a breach and for giving an appropriate remedy." *Id*, citations omitted. The Court "may fashion less essential terms that were omitted, in order to reach a fair and just result. However, "if the parties' manifestations taken together as making up the contract, when reasonably interpreted in the light of all the circumstances, do not enable the court to determine what the agreement is and to enforce it without, in effect, 'making a contract for the parties,' no enforceable obligation results." *Id.* at \*15, citations omitted.

In the instant case, the terms of the repayment of the loan is not a "less essential" term that the Court can fashion. Conaway stated at his deposition that the "terms of the loan was that he would pay me back the money as soon as Stark Truss could afford to pay me back the

money." Conaway Depo. P. 45.  This "term" is not sufficiently definite for this Court to determine there has been a breach.  Stark does not point to anything in the record to show that Stark could, in fact, afford to pay him back, or even that there was a time frame contemplated in which the repayment would occur.  The Court concludes that, upon his own admission, Conaway cannot show terms that are sufficiently definitive to support an enforceable contract between the parties.  As such, Stark has demonstrated that it is entitled to judgment as a matter of law on this issue.

*Unjust Enrichment and the 2008 Oral Contract*

Conaway asserts a claim for unjust enrichment, again in the alternative, if this Court concludes that the 2008 agreement was not an enforceable oral contract.  As explained above, 'Unjust enrichment is an equitable doctrine to justify a quasi-contractual remedy that operates in the absence of an express contract or a contract implied in fact to prevent a party from retaining money or benefits that in justice and equity belong to another."  *Wuliger v. Mfrs. Life Ins. Co.*, 567 F.3d 787, 799 (6th Cir.2009).

Upon review, the Court concludes that Conaway has failed to raise a genuine issue of material fact with regard to his claim for unjust enrichment -- namely, Conaway has failed to demonstrate any inequitable conduct on behalf of Stark.  He has pointed to nothing that, under the terms he testified governed the loan agreement, would have triggered Stark's obligation to pay the loan.  He testified that the loan was to be repaid "as soon as Start Truss could afford to pay me back the money."  The evidence presented shows that, the next year, 2009, the Texas Plants were not profitable. Conaway does not point to anything to prove that Stark was in a position to pay back the loan, thus he has failed to show that Stark has not complied with his own alleged terms.

Accordingly, Conaway's allegation of unjust enrichment is dismissed.

*Fraud*

Lastly, Conaway alleges fraud in that Stark intentionally misrepresented to him that it intended to reimburse him for the $200,000, when in fact it had no intention to do so.

> "Under Ohio law, the elements of fraud are as follows
> (a) a representation or, where there is a duty to disclose, concealment of a fact,
> (b) which is material to the transaction at hand,
> (c) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred,
> (d) with the intent of misleading another into relying upon it,
> (e) justifiable reliance upon the representation or concealment, and
> (f) a resulting injury proximately caused by the reliance."

*Cain v. Chesapeake Exploration*, LLC, 2012 WL 3263792, *2 (N.D. Ohio Aug. 2, 2012), quoting *Burr v. Stark Cty. Bd. Of Commrs.,* 23 Ohio St.3d 69, ¶ 2, 491 N.E.2d 1101 of syllabus (1986) (citing *Cohen v. Lamko, Inc.*, 10 Ohio St.3d 167, 462 N.E.2d 407 (1984)). Conaway's complaint only alleges that Stark intentionally misrepresented to him that they would repay the loan. He fails to assert any of the other elements of the claim. This failing aside, it is clear from the evidence presented in Stark's motion for summary judgment that Conaway can point to no evidence to support this claim.

With regard to repayment, Conaway testified that Groom "said he would see that Stark Truss got the money back to me into my account." Conaway Depo. P. 47. Again, he testified that there were no terms negotiated on this payback. Even construing all of Conaway's representations on the conversation in the light most favorable light to him, there is nothing in his recitation of the events that the Court could conclude was an intentional misrepresentation to reimburse Conaway. Conaway explained that the only term on the repayment was that Stark would "pay me back the money as soon as Stark Truss could afford to pay me back the money."

Conaway Depo. P. 45.  When he later requested the money upon his termination in 2010, he testified that he was told "that the company had lost money so, therefore, they were not going to pay it."  Conaway Depo. P. 53.  Conaway's deposition testimony appears to show that even if Stark had promised to repay him, they were not in the position to do so.  This fits squarely within Conaway's "terms."

Finally, when asked whether he believed Don Groom was trying to defraud him when he asked for the $200,000, Conaway answered "No."  Conaway Depo. P. 54.  He also testified that he had known groom for 35 years and "[h]e's a very good Christian man, I do trust him."  While true that these statements are Conaway's opinion and not a legal conclusion, it is telling of the parties' intentions during a discussion in which only two people were involved.

Conaway has set forth no facts to support this claim, nor does he point to anything in his response to Stark's summary judgment that would satisfy his burden on summary judgment.  Accordingly, Conaway's claim of fraud is dismissed.

**Stark's Counterclaim**

Stark asserts claims for breach of contract and unjust enrichment based upon Conaway's draw against funds made in May of 2009.  Stark contends that Conaway requested a draw of $75,000, which was granted.  Upon the yearly reconciliation of the account, it was determined that there were no net profits in the Texas plants.  Therefore, Stark contends that pursuant to the Compensation Agreement, there was an overpayment of $75,000.  As this Court has explained, there is an express contract setting forth the provisions of Conaway's compensation, and therefore, the contract governs.  As such, there is no claim for unjust enrichment.

As the above reasoning sets forth, the Compensation Agreement at issue contemplates a yearly reconciliation of the Conaway's Commission Account.  Conaway continues to assert that,

because he earned the funds *monthly* he earned commission during the three months in 2009 that the Texas plants were profitable. The Court has already disposed of that argument. The net profits were to be calculated yearly. Conaway does not dispute that there were no net profits for the year of 2009. Therefore, his commission should have been zero. As it is clear he withdrew $75,000, to which it was later determined he was not entitled, Stark's motion for summary judgment on this issue is similarly granted.

### IV. Conclusion

Stark's motion for summary judgment is GRANTED in its entirety. Conaway's C omplaint is hereby DISMISSED. Judgment is hereby entered in favor of Stark on both the Complaint and its Counterclaim.

    IT IS SO ORDERED.

September 27, 2013                      */s/ John R. Adams*
                                             JUDGE JOHN R. ADAMS
                                             UNITED STATES DISTRICT COURT